Page 11

1  Q  Yes, ma'am.
2  A  I'll guess ten. I don't have the exact number.
3  Q  Is one of those entities, which is a client of J.C.
4     Christensen, Resurgent Capital Services?
5  A  Resurgent Capital Services is our client, but they are a
6     debt collection company also.
7  Q  And who do they work for?
8  A  I believe they work for LVNV Funding.
9  Q  Is LVNV Funding itself a client of J.C. Christensen?
10 A  No, it is not.
11 Q  So you work only and directly with Resurgent Capital?
12 A  Yes.
13 Q  I see. You told me, Mrs. Stellmach, that when you get
14    the information in, when J.C. Christensen receives
15    information, electronically or otherwise, I guess, from
16    a client, you input it into your system --
17 A  Yes.
18 Q  -- correct?
19 A  Yes.
20 Q  What kind of system does J.C. Christensen use?
21 A  We have the Artiva Collection System.
22 Q  Can you tell me what that is?
23       MR. KOHLMYER: Object to form.
24 Q  (By Mr. Condon) You said Artiva Collection System. Is
25    that like a computer program or what?

EXHIBIT 3

Page 16

1    personnel, and then the other two handle the contacting
2    clients with questions, there's -- and the other two
3    handle the financial services piece.
4  Q  Which two are you referring to as administrative
5    personnel?
6  A  Pat Brisbin and Michelle Gerads handle our
7    administrative items.
8  Q  Have you worked in that department yourself?
9  A  I have not.
10 Q  Are you familiar with the volume coming into that
11   department?
12 A  Pardon me?
13 Q  Are you familiar with the volume of accounts that's
14   coming into that department to be put into the Artiva
15   System?
16 A  No, I am not.
17 Q  Do you know whether the information that is sent by your
18   clients is ever incorrect?
19       MR. KOHLMYER:  Object to form.  You can
20 answer, if you can.
21       THE WITNESS:  Okay.  Repeat the question,
22 please.
23 Q  (By Mr. Condon) Do you know whether the information
24   that is sent in to J.C. Christensen one way or another
25   by its clients is ever incorrect?

Page 17

1          MR. KOHLMYER: Object to form. You can
2    answer.
3          THE WITNESS: Yes.
4    Q   (By Mr. Condon) How often does that happen?
5          MR. KOHLMYER: Object to form. You can
6    answer.
7          THE WITNESS: I don't know the number.
8    Q   (By Mr. Condon) Well, can you just give me kind of a
9        feeling for it? Is it very often? I mean, we're
10       talking about many, many numbers and accounts here,
11       right?
12   A   We have processes in place that if information comes in
13       incorrectly it's caught before it is loaded because of a
14       verification process that we have in our downloads.
15   Q   Could you tell me about your verification process?
16   A   Yes. The information that's loaded to the system
17       typically we get an email from a client that there is a
18       file waiting to be processed. That file typically
19       includes the dollar amount and the number of accounts
20       that are being placed. We transfer the data and then
21       what's called the script is run, and a script is like a
22       predetermined set of rules for that particular client,
23       and it separates the data into the correct fields.
24          And when I say the correct fields, I mean, so that
25       the phone number goes to the phone number field, the

Case 8:07-cv-01935-EAJ   Document 30-4   Filed 10/13/08   Page 4 of 19 PageID 99
Delilah M. Stellmach - 6/19/2008
Ahmet Hepson v. J.C. Chistensen and Associates, et al

Page 18

1   address goes to the address field, last name goes to the
2   last name field, and we verify that the placement of the
3   data is correct and then we run a batch verification
4   process, and it gives us totals at the bottom to compare
5   the dollar amount and the number of accounts that have
6   run to the original email that we've received.
7 Q How would the batch verification process pick up an
8   incorrectly reported debt?
9 A We rely on the information that's sent to us by the
10   creditor.
11 Q Does J.C. Christensen do anything to verify that the
12   information sent to you by your clients is correct?
13       MR. KOHLMYER: Object to form. You can
14   answer.
15       THE WITNESS: We check the amount and the
16   dollar, we do not -- we do at the beginning, the middle
17   and the end of the batch we do a self-audit to look at,
18   you know, the placement and the dollar amounts of what
19   was on the original download, so yes.
20 Q (By Mr. Condon) But do you have any way to tell whether
21   that original download amount is correct or not?
22 A No, we do not.
23 Q Is it common that J.C. Christensen receives
24   communications from alleged debtors saying that they
25   don't owe a debt that J.C. Christensen is trying to

Case 8:07-cv-01935-EAJ  Document 30-4  Filed 10/13/08  Page 5 of 19 PageID 100
Delilah M. Stellmach - 6/19/2008
Ahmet Hepson v. J.C. Chistensen and Associates, et al

Page 26

1         MR. KOHLMYER: Same objection.
2         THE WITNESS: The creditor to us is our
3    client.
4  Q  (By Mr. Condon) Isn't it so, though, that the creditor
5    is the person or the entity to whom money is owed?
6         MR. KOHLMYER: Object to form. You can
7    answer.
8         THE WITNESS: Can you repeat the question?
9  Q  (By Mr. Condon) Isn't the creditor, in fact, the entity
10   or the person to whom money is owed?
11        MR. KOHLMYER: Same objection.
12        THE WITNESS: Yes.
13 Q  (By Mr. Condon) But in this case the money was not owed
14   to Resurgent Capital Services, was it?
15 A  Yes, it was.
16 Q  Are you saying that Resurgent Capital Services was the
17   owner of the debt?
18        MR. KOHLMYER: Object to form. You can
19   answer.
20        THE WITNESS: They are our client so that's
21   what would remain in the creditor field.
22 Q  (By Mr. Condon) But you know, don't you, from working
23   with Resurgent in the past that the actual debt is owed
24   to LVNV Funding; isn't that true?
25        MR. KOHLMYER: Object to form. You can

Case 8:07-cv-01935-EAJ   Document 30-4   Filed 10/13/08   Page 6 of 19 PageID 101
Delilah M. Stellmach - 6/19/2008
Ahmet Hepson v. J.C. Chistensen and Associates, et al

Page 34

1    within 30 days after receiving this notice, this office

2    will provide you with a name and address" -- again, I'm

3    cut off -- "creditor if different from the current

4    creditor."

5  Q  Do you not have a better copy than what you're looking

6    at now?

7  A  I do not.

8  Q  When this type of letter is sent out what happens when

9    you receive a dispute letter or a validation contact or

10    a request from a debtor?

11  A  When JCC receives a dispute letter or validation the

12    account is marked as disputed and information -- or the

13    account is ceased and noted that the consumer is

14    disputing the account.

15  Q  Okay.

16  A  And we request information from our client if it's not

17    available to us for the information to be able to

18    validate the debt.

19  Q  Does J.C. Christensen validate its own debts?

20  A  If the information is provided to us at the time of

21    placement, otherwise we request it from our client.

22  Q  Was that -- was validation information provided to J.C.

23    Christensen at the time of placement of this debt?

24  A  No, it was not.

25  Q  What information was given to J.C. Christensen?

1  A  The information that would be in the demographic area of
2     our system; name, address, city, state, phone numbers,
3     Social Security Number, account number, the amount
4     referred.
5  Q  What did -- well, strike that. First of all, let me ask
6     you this. Let's go back a little bit. The amount owed
7     we talked about earlier you stated on your letter was
8     $2,679.18, correct?
9  A  Yes.
10 Q  Now, where did that number -- that amount come from?
11 A  That amount came from our creditor --
12 Q  From --
13 A  -- or from Resurgent, our client.
14 Q  Okay. And have you reviewed your records with regard to
15    the amount prior to coming to the deposition today?
16 A  Yes.
17 Q  Have you confirmed that that indeed was the amount that
18    Resurgent Capital Services told you was owed?
19 A  The original amount that was placed with J.C.
20    Christensen in the tape -- or in the download was
21    $2,024.17, and a balance adjustment was received from
22    Resurgent that same day adjusting it up to the $2,600 as
23    stated.
24 Q  Does that -- is that reflected on the records of this
25    account?

Case 8:07-cv-01935-EAJ Document 30-4 Filed 10/13/08 Page 8 of 19 PageID 103
Delilah M. Stellmach - 6/19/2008
Ahmet Hepson v. J.C. Chistensen and Associates, et al

Page 36

1   A   On the communication log, yes, it is.
2   Q   Does the -- when a balance adjustment is made does the
3       client give a reason for the balance adjustment?
4   A   I don't know if Resurgent gives us a reason for the
5       adjustment.
6   Q   Do you have the communication log with you today?
7   A   Yes, I do.
8   Q   Would you look and see if there is any indication as to
9       why the balance adjustment was made?
10  A   There is not, it just indicates that it's an interest
11      adjustment.
12  Q   Is the principle amount reflected?
13  A   Yes.
14  Q   How much was the principle?
15  A   $2,024.17.
16  Q   Does J.C. Christensen have any way to check the accuracy
17      of that information?
18  A   No, we do not.
19  Q   Does J.C. Christensen make any attempt in any way to
20      validate the accuracy of such information?
21  A   No, we do not.
22  Q   Is it unusual to get a balance adjustment like that?
23  A   No, it is not.
24  Q   Do you know what the interest rate was on this
25      particular debt?

Case 8:07-cv-01935-EAJ   Document 30-4   Filed 10/13/08   Page 9 of 19 PageID 104
Delilah M. Stellmach - 6/19/2008
Ahmet Hepson v. J.C. Chistensen and Associates, et al

Page 40

1  A  Yes.
2  Q  When this letter came in what was done with it?
3  A  The account was noted on 11-21-06 that a letter was
4     received.
5  Q  Okay. Who would have physically received the letter?
6  A  One of our administrative assistants.
7  Q  And would they have noted the contact log or would
8     somebody else have done that?
9  A  The administrative assistant would have marked the
10    communication log.
11 Q  Can you look at the communication log now and tell me
12    exactly what was input on November 21st?
13 A  Received letter, will scan.
14 Q  Anything else?
15 A  No.
16 Q  It doesn't say whether it's a validation letter or a
17    letter disputing the debt or disputing the amount or
18    anything else?
19 A  Correct.
20 Q  Why not?
21 A  At the time this letter would have gone to a collection
22    supervisor to review or someone else to review, the
23    administrative assistant would have documented the file
24    and ceased the account.
25 Q  And did what to the account?

1  A  Ceased the account.
2  Q  What does that mean?
3  A  Means they would take the phone numbers out so calls
4     wouldn't be made.
5  Q  Okay. Would you look on your communication log and tell
6     me were there phone calls made before November 21, 2006
7     or attempted to be made to Mr. Hepson?
8  A  Yes.
9  Q  How many?
10 A  11.
11 Q  Were there any calls made or attempted calls made to
12    Mr. Hepson after November 21, 2006?
13 A  No.
14 Q  Is that a result of the notation made on November 21st?
15 A  Yes.
16 Q  What would the -- what would have happened next with
17    regard to this particular letter? After the
18    communication log was noted, what happens then?
19 A  We would contact our client that a dispute letter had
20    been received and forward it to them.
21 Q  In this case was that done?
22 A  Yes.
23 Q  How would Resurgent Capital Services have been
24    contacted?
25 A  We would have faxed them a copy of the notice.

1  Q  Do you send them a cover sheet when you fax it?
2  A  Yes, we do.
3  Q  Do you have a copy of that cover sheet in your records?
4  A  No, I do not.
5  Q  Would it be available?
6         MR. KOHLMYER: Object to form. You can answer
7     if you know.
8         THE WITNESS: I don't know that it would be
9     available.
10 Q  (By Mr. Condon) Is that a standard procedure for all
11    clients of J.C. Christensen or only in the case of
12    Resurgent Capital Services?
13 A  Resurgent Capital Services requires we send them copies
14    of dispute letters.
15 Q  So that's just the way you have it set up with them?
16 A  Yes.
17 Q  Okay. When was this letter from Mr. Hepson forwarded to
18    Resurgent?
19 A  On November 30th.
20 Q  That would have been nine days after it was received?
21 A  Yes.
22 Q  Why the nine-day lag?
23        MR. KOHLMYER: Object to form. You can answer
24    if you know.
25        THE WITNESS: I don't know. It was likely in

1   the administrative assistant's log to do.
2  Q  (By Mr. Condon) With regard to the communication log
3   was there any other action taken of any kind between
4   November 21, 2006 and November 30th when the letter was
5   faxed to Resurgent?
6  A  No, there was not.
7  Q  Does the communication log reflect what happened next?
8  A  Yes.
9  Q  What happened?
10 A  The account was closed.
11 Q  Who closed it?
12 A  J.C. Christensen and Associates.
13 Q  Was it closed as a matter of policy or procedure by J.C.
14   Christensen or were you directed to do so by your
15   client?
16 A  It was closed by JCC and it doesn't indicate -- the
17   system doesn't indicate if it was a client request or
18   whether it was JCC that requested the close.
19 Q  Do you know?
20 A  I do not.
21 Q  Do you have procedures in place for some debts where if
22   a dispute or validation request is received JCC
23   automatically closes the account?
24 A  If we are unable to get validation an account may be
25   closed.

Page 44

1   Q   Did J.C. Christensen in this case request validation
2       information from Resurgent as a result of this November
3       16th letter?
4   A   We sent them the dispute letter.
5   Q   And then what happens then?  Do you wait to hear back
6       from them --
7   A   Yes.
8   Q   -- or do you automatically close the file?
9   A   We -- I'm not familiar with the policy for Resurgent as
10      far as, you know, closing disputed accounts or whether,
11      you know, it's just something we automatically do.
12  Q   Who would have that information?
13  A   Our chief operating officer.
14          MR. KOHLMYER:  Delilah, did you hear the last
15      question?
16          THE WITNESS:  No, I did not.
17  Q   (By Mr. Condon) Oh.  I had asked, what is your chief
18      operating officer's name?
19  A   Chad Lemke.
20  Q   Is he located in Sauk Rapids?
21  A   Yes, Sartell.
22  Q   Is there a contract that exists between Resurgent
23      Capital Services and J.C. Christensen?
24  A   Yes, there is.
25  Q   Do you have a copy of it?

Page 61

1            THE WITNESS:  Yes.
2    Q   (By Mr. Condon)  So you know that the figures given to
3        you sometimes will be wrong, correct?
4            MR. KOHLMYER:  Object to form.
5            THE WITNESS:  Yes.
6    Q   (By Mr. Condon)  What does J.C. Christensen do to ensure
7        that that doesn't happen?
8    A   We, in the downloads, again, make sure that what we're
9        loading to the system is going to the correct fields
10       verifying the number and dollar amounts of the accounts
11       being placed matches with what's sent to us by the
12       creditor and then we also check, you know, spot check
13       the accounts to ensure that the information is correct.
14   Q   But your testimony just a minute ago, Ms. Stellmach, was
15       that J.C. Christensen relies upon its clients to give
16       correct information, right?
17   A   We do.
18           MR. CONDON:  That's all I have.
19           MR. KOHLMYER:  Ms. Stellmach, let me just ask
20       you just a couple follow-up questions.
21                    EXAMINATION
22   BY MR. KOHLMYER:
23   Q   Is there any information in the collection notes or
24       anything in which you are personally aware of as to
25       whether the balance or the charges that were incurred on

1      this account were for personal, family or household
2      purposes?
3              MR. CONDON:  Object to the form of the
4      question.
5              THE WITNESS:  Can you repeat the question?
6   Q  (By Mr. Kohlmyer)  Sure.  Do you have any idea what
7      items were purchased or how this balance was created
8      whether or not it was -- the debt was incurred for
9      personal, family or household purposes?
10  A  No, I do not.
11  Q  Okay.  I want you to look at the exhibit in which
12     Mr. Hepson sent a letter, the November 16th --
13  A  Okay.
14  Q  -- marked as an exhibit, I think it's Exhibit B.
15  A  Yes.
16  Q  Is there anywhere in that letter in which Mr. Hepson
17     discloses or identifies that the balance that's in the
18     letter is incorrect?  And take your time to read the
19     letter.
20  A  Okay.  Okay.  Can you repeat the question one more time
21     for me?
22  Q  Sure.  In reviewing the letter that Mr. Hepson wrote and
23     you received on November 16, 2006, does anywhere in that
24     letter indicate or does he convey any information that
25     the account balance is incorrect?

Page 63

1　　　　　MR. CONDON: Object to the form of the
2　question, the document speaks for itself.
3　　　　　THE WITNESS: No.
4　Q　(By Mr. Kohlmyer) Okay. Do you see anything in that
5　document that Mr. Hepson is informing JCC that the
6　balance is incorrect?
7　　　　　MR. CONDON: Object to the form of the
8　question.
9　　　　　THE WITNESS: No, I do not.
10　Q　(By Mr. Kohlmyer) Okay. You had answered a question
11　about what devices are used or what policies are in
12　place to correct balances. If a consumer notifies
13　through correspondence that the balance is incorrect,
14　does JCC have a procedure or policy in which they go
15　back and coordinate with the original creditor or your
16　client to ensure the accuracy that the balance is
17　reflecting on the account?
18　　　　　MR. CONDON: Object to the form of the
19　question.
20　　　　　MR. KOHLMYER: What's wrong with the form?
21　　　　　MR. CONDON: Leading.
22　　　　　MR. KOHLMYER: Well -- okay.
23　Q　(By Mr. Kohlmyer) Is there a policy and procedure in
24　place that JCC has in place that allows them to
25　investigate the accuracy of the balance on a particular

Case 8:07-cv-01935-EAJ   Document 30-4   Filed 10/13/08   Page 17 of 19 PageID 112
Delilah M. Stellmach - 6/19/2008
Ahmet Hepson v. J.C. Chistensen and Associates, et al

Page 64

1    file when notified by the consumer?
2  A  Yes.
3  Q  And what is that?
4  A  We either call our client or send the information to our
5     client to clarify, ask for -- or ask for the validation
6     to support that.
7  Q  Okay. And is there a mechanism in place in which the
8     original creditor can make balance adjustments on the
9     system if the balance is wrong or incorrect?
10        MR. CONDON: Object to the form of the
11    question, asked and answered.
12        THE WITNESS: Yes.
13 Q  (By Mr. Kohlmyer) Okay. And was that done in this
14    case?
15 A  Yes.
16 Q  Okay. On this collection note screen what was the date
17    that the account was received?
18 A  10-26-06.
19 Q  Okay. And according to the notes, once you received Mr.
20    Hepson's November 16, 2006 letter was the account marked
21    as disputed?
22 A  The letter was received on 11-21-06 and it was marked as
23    disputed.
24 Q  And according to your notes then you were -- you sent
25    this information in this letter over to the original

Case 8:07-cv-01935-EAJ   Document 30-4   Filed 10/13/08   Page 18 of 19 PageID 113
Delilah M. Stellmach - 6/19/2008
Ahmet Hepson v. J.C. Chistensen and Associates, et al

Page 65

1     creditor or your client?
2  A  Yes.
3         MR. CONDON: Object to the form of the
4     question.
5         MR. KOHLMYER: I'll withdraw my question.
6  Q  (By Mr. Kohlmyer) Upon receiving the November 16, 2006
7     letter at some time did you send that to Resurgent?
8  A  Yes.
9  Q  And what was the purpose of that?
10 A  To alert them that there was a dispute on the account.
11 Q  Okay. And is it a regular practice and procedure with
12    your experience would your client, including Resurgent,
13    that they would respond to disputes in a letter and
14    convey information back to you?
15 A  Yes.
16 Q  And has it been a policy and procedure that if
17    verification is requested that Resurgent provide
18    verification through account statements or any
19    information that they may --
20        MR. CONDON: Object to the form of the
21    question.
22 Q  (By Mr. Kohlmyer) Upon request has Resurgent sent
23    verification of debt back to your company --
24        MR. CONDON: Object to the form of the
25    question.

Case 8:07-cv-01935-EAJ   Document 30-4   Filed 10/13/08   Page 19 of 19 PageID 114
Delilah M. Stellmach - 6/19/2008
Ahmet Hepson v. J.C. Chistensen and Associates, et al

Page 66

1  Q  (By Mr. Kohlmyer) -- in the past?
2  A  I don't know what kind of backup we get from Resurgent
3     when dispute information is conveyed to them.
4  Q  And any information that you would get from Resurgent as
5     far as backup information would that be communicated
6     back to the consumer?
7        MR. CONDON:  Object to the form of the
8     question.
9        THE WITNESS:  Yes.
10 Q  (By Mr. Kohlmyer) Okay.  Was the account closed prior
11    to the ex -- strike that.  Was the account closed prior
12    to receiving any information as far as verification or
13    response back from Resurgent?
14 A  Yes.
15 Q  Was there any need after the account was closed to
16    continue with collection activity?
17 A  No.
18 Q  As you sit here today, based on the information, are you
19    aware of any information either from Resurgent or from
20    any other source in which reflects that the balance that
21    was put on the collection letter which is Exhibit A was
22    incorrect?
23 A  No.
24       MR. KOHLMYER:  Okay.  That's all I have.
25       MR. CONDON:  Redirect.